WOLLMUTH MAHER & DEUTSCH LLP
David H. Wollmuth (DW-9618)
dwollmuth@wmd-law.com
Frederick R. Kessler (FK-8168)
fkessler@wmd-law.com
One Gateway Center
Newark, NJ 07102
(973) 733-9200

Attorneys for Plaintiff

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRENDAN FOOTE, in His Capacity as Trustee on Behalf of the SEPARATE PROPERTY TR U/A DTD 10-26-12, Derivatively on Behalf of BLACKROCK GLOBAL ALLOCATION FUND, <br><br> Plaintiff, <br><br> v. <br><br> BLACKROCK ADVISORS, LLC, <br><br> Defendant, <br><br> -and- <br><br> BLACKROCK GLOBAL ALLOCATION FUND, <br><br> Nominal Defendant. | Case No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT <br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff Brendan Foote, in his capacity as trustee on behalf of the Separate Property TR U/A DTD 10-26-12, located at 2593 Via Pisa, Del Mar, California, 92014, by his attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a derivative action brought by plaintiff on behalf of BlackRock Global Allocation Fund ("Global Allocation Fund") against defendant BlackRock Advisors, LLC

("BRA") pursuant to section 36(b) of the Investment Company Act of 1940 ("ICA"), as amended 15 U.S.C. §80a-35(b) ("Section 36(b)").

2.      Defendant BRA is the Global Allocation Fund's investment manager/adviser, for which it charges the Global Allocation Fund fees.  These fees, however, are improper and excessive.  To start, defendant BRA delegates almost all of its investment management duties to its sub-adviser BlackRock Investment Management, LLC ("BIM").  Despite this fact, defendant BRA retains a substantial portion in fees that it charges the Global Allocation Fund.  For example, in fiscal year 2013, the Global Allocation Fund paid defendant BRA over *$412.5 million* in investment management fees.  Of that sum, defendant BRA paid BIM just $235.1 million, retaining over *$177.3 million* for itself, despite doing little, if any, work.  Indeed, the additional administrative and supervisory services provided by defendant BRA are minimal and the Global Allocation Fund pays for many of these additional services through separate agreements and/or fees.

3.      Next, defendant BRA's fee schedule is not designed for the Global Allocation Fund and its shareholders to take advantage of the savings arising from economies of scale.  An accepted precept in the mutual fund industry is that it is not harder to manage a fund simply because it is bigger.  Therefore, in order to prevent outsized fees, the percentage of assets under management that advisers charge as fees must decrease as the assets grow.  Defendant BRA has not followed this rule.  Despite the Global Allocation Fund's net assets growing by nearly $5 billion and resulting in an additional $30 million in advisory fees for defendant BRA during the 2013 fiscal year, *zero* savings were passed on to the Global Allocation Fund.

4.      Defendant BRA's fees are so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's-length

bargaining.  Accordingly, pursuant to Section 36(b)(3), plaintiff seeks, on behalf of the Global Allocation Fund, the damages resulting from the breaches of fiduciary duties by defendant BRA, including the amount of excessive compensation and payments received by defendant BRA and the rescission of the contracts that form the basis for the excessive and illegal fees.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §80a-43, 15 U.S.C. §80a-35(b)(5), and 28 U.S.C. §1331.

6.     Venue is proper in this judicial district pursuant to section 44 of the ICA, 15 U.S.C. §80a-43, and 28 U.S.C. §1391 because defendant BRA is an inhabitant of this district, maintains offices in this district, and/or transacts business in this district, and because certain of the acts and transactions giving rise to plaintiff's claim occurred in this district.

## PARTIES

**Plaintiff**

7.     Plaintiff Brendan Foote, in his capacity as trustee of the Separate Property TR U/A DTD 10-26-12, owns shares in the Global Allocation Fund.

**Nominal Defendant**

8.     Nominal defendant Global Allocation Fund invests primarily in a portfolio of equity, debt, and money market securities.  As of March 18, 2014, the Global Allocation Fund had net assets of $59.1 billion.  The Global Allocation Fund's principal executive offices are located at 100 Bellevue Parkway, Wilmington, Delaware.

**Defendant**

9.     Defendant BRA is an investment advisor that serves registered companies under the ICA.  Defendant BRA serves as the investment adviser for the Global Allocation Fund.

Defendant BRA is a Delaware limited liability company with an office located at 1 University Square Drive, Princeton, New Jersey.

## BACKGROUND INFORMATION ABOUT THE INVESTMENT MANAGEMENT INDUSTRY AND THE PURPOSE OF SECTION 36(b)

10.     A mutual fund is typically created and managed by a pre-existing organization known as an investment adviser that generally supervises the daily operation of the fund and often selects affiliated persons to serve on the fund's board of trustees.  Congress recognized as early as 1935 that because a typical mutual fund is organized by its investment adviser which provides it with almost all of its management services, and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the adviser.

11.     Because of this relationship in the mutual fund industry, there is no arm's-length bargaining.  As a result, in 1940, Congress enacted the ICA to protect mutual funds and their shareholders from unscrupulous investment advisers.  The conflicts in the inherent structure of mutual funds, including those at issue here, exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated, [and] managed, … in the interest of … investment advisers, … rather than in the interest of [shareholders]."  As stated in the ICA:

> [T]he **national public interest and the interest of investors are adversely affected ... when investment companies are organized, operated, [and] managed ... in the interest of ... investment adviser, ... rather than in the interest of [shareholders]** ... [or] when investment companies ... are not subjected to adequate independent scrutiny.

ICA section 1(b)(2), (5); 15 U.S.C. §80a-1(b).

12.     During the 1960s, Congress realized that investment advisers to equity mutual funds were charging those funds excessive fees.  Thus, Congress added Section 36(b) to the ICA

in 1970. This provision created a federal cause of action for breach of fiduciary duty by investment advisers. Section 36(b) states in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. *An action may be brought under this subsection ... by a security holder of such registered investment company on behalf of such company, against such investment adviser, or an affiliated person of such investment advisor ... for breach of fiduciary duty in respect of such compensation* or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

**DEFENDANT BRA CHARGES THE GLOBAL ALLOCATION FUND EXCESSIVE FEES**

13.     The test for determining whether fee compensation paid to defendant BRA violates Section 36(b) is essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in light of all the surrounding circumstances. Thus, an adviser violates Section 36(b) if it charges a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

14.     As further detailed herein, the investment management fees defendant BRA charged the Global Allocation Fund were so excessive that they were in breach of defendant BRA's Section 36(b) fiduciary duty to the Global Allocation Fund. The excessiveness of the fees are demonstrated by, inter alia: (i) the nature and quality of services provided to the Global Allocation Fund and its shareholders in exchange for the investment management fees; (ii) the failure of defendant BRA to adequately pass economies-of-scale savings on to the Global Allocation Fund and its shareholders, and the retention of those economies-of-scale savings by defendant BRA; (iii) the costs and profitability of defendant BRA's investment management services; and (iv) the failure of the Board of Trustees (the "Board") to exercise the requisite level

of care and conscientiousness in approving the fees paid pursuant to the Investment Management

Agreement ("IMA") between defendant BRA and the Global Allocation Fund.

**The Nature and Quality of the Investment Management Services Performed by Defendant BRA Do Not Justify Defendant BRA's Fee**

15.     Defendant BRA is tasked with managing the investment and reinvestment of the

Global Allocation Fund's assets pursuant to the IMA defendant BRA entered into with the

Global Allocation Fund.  Defendant BRA's IMA with the Global Allocation Fund states that

defendant BRA must fulfill the following general responsibilities: (i) "act as investment advisor

for and supervise and manage the investment and reinvestment of the [Global Allocation Fund's]

assets"; (ii) "arrange … for the purchase and sale of securities and other assets held in the

investment portfolio of the [Global Allocation Fund]"; (iii) "provide investment research to the

[Global Allocation Fund]"; (iv) "purchas[e] and sell[] securities and other assets for the [Global

Allocation Fund]"; (v) "supervise continuously the investment program of the [Global Allocation

Fund] and the composition of its investment portfolio"; and (vi) maintain books and records

relating to the Global Allocation Fund's  investment advisory services.

16.     Rather than providing the majority of the investment management services

directly to the Global Allocation Fund, defendant BRA subcontracts with others to provide the

services at a fraction of the fee charged to the Global Allocation Fund.  In particular, defendant

BRA subcontracts its investment management duties to BIM pursuant to a Sub-Advisory

Agreement.[1]  BIM's Sub-Advisory Agreement with the Global Allocation Fund requires BIM to

fulfill the below general responsibilities, which are practically identical to the responsibilities

---

[1] BlackRock International Limited ("BIL") also provided sub-advisory services to the Global Allocation Fund for a portion of the 2013 fiscal year, until July 1, 2013.  The sub-advisory fees discussed herein include fees paid to both BIL and BIM.

outlined above in defendant BRA's IMA with the Global Allocation Fund. In particular, BIM's

Sub-Advisory Agreement with the Global Allocation Fund requires BIM to: (i) "[act] as

investment advisor for and manag[e] the investment and reinvestment of those assets of the

[Global Allocation Fund]"; (ii) arrange "for the purchase and sale of securities and other assets of

the [Global Allocation Fund]"; (iii) "[provide] investment research and credit analysis

concerning the [Global Allocation Fund's] investments"; (iv) "[place] orders for all purchases

and sales of such investments made for the [Global Allocation Fund]"; and (v) maintain books

and records relating to its provision of investment advisory services. The following chart

comparing defendant BRA's and BIM's duties demonstrates how defendant BRA delegates

almost all of its investment management duties to BIM:

| Comparison of Manager and Sub-Adviser Responsibilities | |
|---|---|
| **BRA** | **BIM** |
| <u>Duties and Obligations of the Advisor with Respect to Investment of Assets of the Fund.</u> Subject to the succeeding provisions of this section and subject to the direction and control of the Fund's Board of Directors, the Advisor shall (i) act as investment advisor for and supervise and manage the investment and reinvestment of the Fund's assets and in connection therewith have complete discretion in purchasing and selling securities and other assets for the Fund and in voting, exercising consents and exercising all other rights appertaining to such securities and other assets on behalf of the Fund; (ii) supervise continuously the investment program of the Fund and the composition of its investment portfolio; (iii) arrange, subject to the provisions of paragraph 4 hereof, for the purchase and sale of securities and other assets held in the investment portfolio of the Fund; and (iv) provide investment research to the Fund. | <u>Services of the Sub-Advisor.</u> Subject to the succeeding provisions of this section, the oversight and supervision of the Advisor and the direction and control of the Fund's Board of Directors, the Sub-Advisor will perform certain of the day-to-day operations of the Fund, which may include one or more of the following services, at the request of the Advisor: (a) acting as investment advisor for and managing the investment and reinvestment of those assets of the Fund as the Advisor may from time to time request and in connection therewith have complete discretion in purchasing and selling such securities and other assets for the Fund and in voting, exercising consents and exercising all other rights appertaining to such securities and other assets on behalf of the Fund; (b) arranging, subject to the provisions of paragraph 3 hereof, for the purchase and sale of securities and other assets of the Fund; (c) providing investment research and credit analysis concerning the Fund's investments, |

| | (d) assist the Advisor in determining what portion of the Fund's assets will be invested in cash, cash equivalents and money market instruments, (e) placing orders for all purchases and sales of such investments made for the Fund, and (f) maintaining the books and records as are required to support Fund investment operations. At the request of the Advisor, the Sub-Advisor will also, subject to the oversight and supervision of the Advisor and the direction and control of the Fund's Board of Directors, provide to the Advisor or the Fund any of the facilities and equipment and perform any of the services described in Section 3 of the Advisory Agreement. In addition, the Sub-Advisor will keep the Fund and the Advisor informed of developments materially affecting the Fund and shall, on its own initiative, furnish to the Fund from time to time whatever information the Sub-Advisor believes appropriate for this purpose. The Sub-Advisor will periodically communicate to the Advisor, at such times as the Advisor may direct, information concerning the purchase and sale of securities for the Fund, including: (a) the name of the issuer, (b) the amount of the purchase or sale, (c) the name of the broker or dealer, if any, through which the purchase or sale is effected, (d) the CUSIP number of the instrument, if any, and (e) such other information as the Advisor may reasonably require for purposes of fulfilling its obligations to the Fund under the Advisory Agreement. The Sub-Advisor will provide the services rendered by it under this Agreement in accordance with the Fund's investment objectives, policies and restrictions (as currently in effect and as they may be amended or supplemented from time to time) as stated in the Fund's Prospectus and Statement of Additional Information and the resolutions of the Fund's Board of Directors. |
|---|---|

17.   In addition to limiting defendant BRA's duties to general oversight and supervising the sub-advisers, the IMA limits defendant BRA's exposure to liability. In

particular, defendant BRA is not liable for any investment decision made by a sub-adviser. Defendant BRA's IMA with the Global Allocation Fund contains the following language regarding defendant BRA's liability exposure:

> Limitation of Liability. ***Adviser shall not be liable for any error of judgment or mistake of law or for any loss suffered by the Fund in connection with the performance of this Agreement***, except a loss resulting from a breach of fiduciary duty with respect to the receipt of compensation for services or a loss resulting from willful misfeasance, bad faith or gross negligence on its part in the performance of its duties or from reckless disregard by it of its obligations or duties under this Agreement.

18.     Defendant BRA shares its supervisory role with the Board, which further limits defendant BRA's responsibilities.  According to the Statement of Additional Information for the Global Allocation Fund, the Board is responsible for overseeing the Global Allocation Fund's activities, monitoring the quality of services provided to the Global Allocation Fund, and reviewing the Global Allocation Fund's investment performance.

19.     Defendant BRA subcontracting its investment management duties to sub-advisers has no effect on the management fees it charges the Global Allocation Fund.  Rather, the management fees are based on a stated percentage of the Global Allocation Fund's average daily net asset value.  As such, the investment management fees are not based on the services actually rendered or defendant BRA's costs in providing services to the Global Allocation Fund.  For certain funds, defendant BRA has agreed to waive a portion of its advisory fees, resulting in slightly lower effective rates for those funds.  However, these waivers are just designed to create the illusion of savings for fund holders.  Defendant BRA has only agreed to fee waivers for select funds and, where they exist, the fee reductions are minimal.  The funds that receive fee waivers still pay fees that are drastically out of proportion to the services provided by defendant BRA.  The Global Allocation Fund paid defendant BRA ***$412.5 million*** in advisory fees for the 2013 fiscal year, over $177.3 million of which went to defendant BRA for doing almost no work.

In the 2013 fiscal year, defendant BRA waived just $47 million in fees, only 11% of the total fees defendant BRA charged the Global Allocation Fund. Defendant BRA's effective fee schedule with the Global Allocation Fund including waivers is as follows:

| Fund | Stated Advisory Fee | Investment Advisory Fees (most recent fiscal year) |
|---|---|---|
| Global Allocation Fund | Tiered: 0.60% to 0.75% | $412.5 million |

20.     In exchange for its services, defendant BRA in turn pays fees to its sub-adviser BIM. While the Global Allocation Fund paid defendant BRA over *$412.5 million* in advisory fees for the 2013 fiscal year, BIM was paid just *$235.1 million* for its sub-advisory services. In 2013, defendant BRA retained over *$177.3 million* of the fees paid to it by the Global Allocation Fund despite delegating almost all of its duties to BIM. The retained fees represented over *75%* of the fees paid to the sub-advisers for actually managing the Global Allocation Fund's portfolios. The following table reflects the material difference in the fees defendant BRA charged the Global Allocation Fund, and the fees defendant BRA paid BIM for substantially the same service in 2013:

| Fund | Net Paid to BRA | Net Paid to BIM | Fees Retained by BRA | BRA's Fees as a Percentage of Subadviser's Fees |
|---|---|---|---|---|
| Global Allocation Fund | $412,500,349 | $235,175,432 | $177,324,917 | 75% |

21.     The higher fees paid by the Global Allocation Fund are not justified by any additional services provided to the Global Allocation Fund by defendant BRA. In addition to the investment advisory services discussed above, the IMA purportedly requires certain administrative services to be provided to the Global Allocation Fund. These administrative services include overseeing the daily pricing of the Global Allocation Fund's portfolio securities, overseeing the maintenance of certain books and records by the Global Allocation Fund's other

service providers, overseeing the preparation and filing of the Global Allocation Fund's tax returns, preparing financial information for the Global Allocation Fund's shareholder reports and other required U.S. Securities and Exchange Commission ("SEC") filings, and responding to shareholder inquiries about the Global Allocation Fund or referring those inquiries to the Global Allocation Fund's other service providers.   According to publicly disclosed administrative services agreements for other mutual funds, all of these administrative services covered by the IMA are *de minimus* and can be obtained from unaffiliated service providers through arm's-length negotiations for less than five basis points.[2]

22.     Indeed, the Global Allocation Fund has separate agreements with State Street Bank and Trust ("State Street") that require State Street to provide many of the same administrative services, including accounting services that are purportedly provided under the IMA, and require the Global Allocation Fund to pay a separate fee to State Street for those services.   As shown in the following chart, the Global Allocation Fund paid State Street nearly $15 million during its three most recently reported fiscal years for purported "accounting services":

| Accounting Services Fees Paid to State Street | |
| --- | --- |
| 2011 | $5,021,449 |
| 2012 | $4,988,445 |
| 2013 | $4,931,591 |
| **Total** | **$14,941,485** |

23.     Further, defendant BRA receives additional compensation, separate and apart from the fees paid by the Global Allocation Fund under the IMA, for certain of the administrative services purportedly provided under the IMA.   For example, as shown in the

---

[2] A basis point is a unit of measure used in finance to describe the percentage change in the value or rate of a financial instrument.  One basis point is equivalent to 0.01% (1/100th of a percent).

following chart, the Global Allocation Fund paid defendant BRA more than $1.7 million during its three most recently reported fiscal years for purported "accounting services":

| Accounting Services Fees Paid to BRA | |
|---|---|
| 2011 | $618,009 |
| 2012 | $536,923 |
| 2013 | $615,357 |
| Total | $1,770,289 |

These fees for accounting services are in addition to the amounts the Global Allocation Fund paid under its IMA purportedly for having defendant BRA prepare its tax returns and required filings.

24.      In addition, as shown in the following chart, the Global Allocation Fund paid defendant BRA more than $2.4 million during its three most recently reported fiscal years for "maintain[ing] a call center, which is responsible for providing certain shareholder services to the Funds, such as responding to shareholder inquiries...." This call center fee is in addition to the amounts the Global Allocation Fund paid under its IMA purportedly for responding to shareholder inquiries or referring those inquiries to the Global Allocation Fund's other service providers.  In particular, the Global Allocation Fund paid defendant BRA the following amounts between 2011 and 2013 for maintaining a call center:

| Investor Service Center Fees Paid to BRA | |
|---|---|
| 2011 | $885,546 |
| 2012 | $783,498 |
| 2013 | $764,594 |
| Total | $2,433,638 |

25.      Accordingly, despite the fact that BIM manages 100% of the Global Allocation Fund's assets, BIM charges defendant BRA only 57% of the total fees that defendant BRA charges the Global Allocation Fund.   Although the IMAs task defendant BRA with the

responsibility of assigning, overseeing, and evaluating the assets managed by the sub-advisers, these responsibilities are minimal compared to the day-to-day responsibilities of managing the Global Allocation Fund's portfolio, *and are worth even less when taking into account defendant BRA's limitation of liability for BIM's actions*, defendant BRA sharing its supervisory role with the Board, and defendant BRA sharing its administrative duties with unaffiliated service providers.

**Economies of Scale Enjoyed in Connection with the Investment Management Services Were Not Passed on to the Global Allocation Fund as Required by Section 36(b)**

26.   The legislative history of Section 36(b) recognizes that an investment adviser's failure to pass on economies of scale to the fund is one of the principal causes of excessive fees. Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets.  The work required to operate a mutual fund does not increase proportionately with the assets under management.  Investment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size.  A portfolio manager can invest $100 million nearly as easily as $1 billion, and $1 billion nearly as easily as $10 billion.  Economies of scale should lead to lower fees as assets under management increase.

27.   The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office.  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services.

28.   Mutual fund structures often use "breakpoints" – the point at which a fee rate decreases when net assets increase – to pass on to shareholders the benefits realized from such economies of scale.  Defendant BRA's breakpoints did not give the Global Allocation Fund and

its shareholders meaningful benefits from the economies of scale enjoyed by the Global Allocation Fund. In particular, defendant BRA's fee schedule sets the initial break points too high, spaces them too far apart, and reduces the fee by too small an amount to give the Global Allocation Fund and its shareholders any meaningful benefit of the economies of scale.

29. As demonstrated by the fee schedule below, very large increases in the Global Allocation Fund's assets under management result in very small decreases in its investment advisory fee rate. The first breakpoint does not take effect until $10 billion in assets under management, and that breakpoint reduces the fee rate on assets under management over $10 billion by only six basis points, from 0.75% to 0.69%. Subsequent breakpoints take effect at intervals of $5 billion up to $30 billion in assets under management, with each breakpoint reducing the fee rate by one or two basis points, to 0.68% on assets under management from $15 billion to $20 billion, 0.67% on assets under management from $20 billion to $25 billion, and 0.65% on assets under management from $25 billion to $30 billion. The investment advisory fee schedule includes another breakpoint at $30 billion, which again reduces the fee rate by two basis points, from 0.65% to 0.63%, on assets under management from $30 billion to $40 billion. Thereafter, breakpoints take effect at intervals of $20 billion in assets under management, with each breakpoint again reducing the fee rate by one basis point, to 0.62% on assets under management from $40 billion to $60 billion, 0.61% on assets under management from $60 billion to $80 billion, and 0.60% on assets under management over $80 billion. The Global Allocation Fund has the following breakpoints:

| Global Allocation Fund - $59.1 Billion in Net Assets | |
|---|---|
| Breakpoint | Fee Rate |
| Up to $10 billion | 0.750% |
| $10 billion to $15 billion | 0.690% |
| $15 billion to $20 billion | 0.680% |

| $20 billion to $25 billion | 0.670% |
|---|---|
| $25 billion to $30 billion | 0.650% |
| $30 billion to $40 billion | 0.630% |
| $40 billion to $60 billion | 0.620% |
| $60 billion to $80 billion | 0.610% |
| Above $80 billion | 0.600% |

30.     Defendant BRA's fee schedules are not designed for the Global Allocation Fund and its shareholders to take advantage of the savings arising from economies of scale.  Although significant economies of scale exist for the Global Allocation Fund, the associated cost savings largely have been appropriated for the benefit of defendant BRA rather than being shared with the Global Allocation Fund.  For example, during the 2013 fiscal year, the Global Allocation Fund's net assets grew from $53 billion to $57.8 billion.  Under the Global Allocation Fund's current advisory fee schedule, the $4.8 billion growth of the Global Allocation Fund's net assets will result in an additional $30 million in advisory fees per year for defendant BRA.  The increase in net assets during the 2013 fiscal year did not trigger a lower advisory fee rate so there was zero savings passed on to the Global Allocation Fund.

31.     The investment management fees paid to defendant BRA are disproportionate to the value of services rendered, and therefore excessive, especially when considering the excess profits resulting from economies of scale.  The economies of scale enjoyed by defendant BRA with respect to the Global Allocation Fund have not been adequately shared with the Global Allocation Fund, as required by Section 36(b), in breach of defendant BRA's Section 36(b) fiduciary duty to the Global Allocation Fund with respect to such compensation.

**The Costs and Profitability of Providing Investment Management Services Does Not Justify Defendant BRA's Excessive Fees**

32.     Defendant BRA's incremental costs of providing management services to the Global Allocation Fund are not substantial, while the additional fees received by defendant BRA

- 15 -

are unreasonable and hugely excessive given that the nature, quality, and level of the services remain the same as assets under management grow. While fees of 0.75% or less may seem inconsequential, these percentages translate into substantial fees when applied to the Global Allocation Fund's assets in the billions of dollars. In fiscal year 2013 alone, defendant BRA was paid a total of over *$412.5 million* in investment management fees from the Global Allocation Fund. Of that sum, defendant BRA paid the Global Allocation Fund's sub-advisers just $235.1 million for sub-advisory services, retaining over *$177.3 million* for itself. Accordingly, the Global Allocation Fund has been very profitable to defendant BRA.

33. The true cost of investment management services should correlate to the fees charged by the sub-advisers. In fact, the fees charged by BIM to defendant BRA include the sub-advisers' costs plus, presumably, a reasonable profit. The fact that BIM is affiliated with defendant BRA is immaterial since BIM charges other funds not affiliated with defendant BRA comparable rates for substantially the same services. For example, in addition to being a sub-adviser for the Global Allocation Fund, BIM also provides sub-advisory services to MassMutual BlackRock Global Allocation, JNL/BlackRock Global Allocation Fund, and AZL BlackRock Global Allocation Fund, all funds organized and sponsored by financial institutions independent of defendant BRA. The sub-advisor fees discussed herein are negotiated at arm's-length by defendant BRA as demonstrated by the following chart in which the Global Allocation Fund and MassMutual BlackRock Global Allocation, JNL/BlackRock Global Allocation Fund, and AZL BlackRock Global Allocation Fund share the same sub-adviser, a similar investment philosophy, and nearly the same effective fee rate:

|  | BRA Advised BlackRock Fund | Non-BRA Advised Fund | Non-BRA Advised Fund | Non-BRA Advised Fund |
|---|---|---|---|---|
| **Fund** | Global Allocation Fund | MassMutual BlackRock Global Allocation | JNL/BlackRock Global Allocation Fund | AZL BlackRock Global Allocation Fund |
| **Philosophy** | The Fund invests in a portfolio of equity, debt and money market securities. Generally, the Fund's portfolio will include both equity and debt securities.…In selecting equity investments, the Fund mainly seeks securities that Fund management believes are undervalued. The Fund may buy debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, and debt securities of any kind, including, by way of example, securities issued or guaranteed by the U.S. Government or its agencies or instrumentalities, by foreign governments or international agencies or supranational entities, or by domestic or foreign private issuers, debt securities convertible into equity securities, inflation-indexed bonds, structured notes, loan assignments and loan participations. In addition, the Fund may invest up to 35% of its total | The Fund seeks to achieve its objective by investing in both equity and debt securities, including money market securities and other short-term debt obligations, of issuers located around the world, including emerging markets, without limitation on the percentage of assets the Fund can invest in a particular type of security. …The Fund may buy debt securities of varying maturities, debt securities paying a fixed or floating rate of interest, and debt securities of any kind, including, by way of example, securities issued or guaranteed by the U.S. Government or its agencies and instrumentalities, by foreign governments or international agencies or supranational entities, or by domestic or foreign private issuers, mortgage-backed or other asset-backed securities, debt securities convertible into equity securities, inflation-indexed bonds, structured notes, and loan participations.…The Fund may invest up to 35% of its total assets in below investment grade debt securities ("junk" or "high yield" bonds), corporate loans, and distressed securities. In the event that a security is downgraded after its purchase by BlackRock, BlackRock may continue to hold the security if BlackRock considers that | The Fund invests in a portfolio of equity, debt and money market securities. Generally, the Fund will invest in both equity and debt securities. Equity securities include common stock, rights and warrants, preferred stock, securities convertible into common stock, or securities or other instruments whose price is linked to the value of common stock. The Fund uses derivatives as a means of managing exposure to foreign currencies and other adverse market movements, as well as to increase returns. At any given time, the Fund may emphasize either debt securities or equity securities. In selecting equity investments, the Fund mainly seeks securities that the Sub-Adviser believes are undervalued. The Fund may buy debt securities with varying maturities. The Fund may invest up to 35% of its total assets in high yield or junk bonds.  Junk bonds are fixed income | "The Fund invests in a portfolio of equity, debt and money market securities. Generally, the Fund's portfolio will include both equity and debt securities.… In selecting equity investments, the Fund mainly seeks securities that the Fund's subadviser believes are undervalued. The Fund may buy debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, and debt securities of any kind, including by way of example, securities issued or guaranteed by the U.S. Government or its agencies or its instrumentalities, by foreign governments or international agencies or supranational entities, or by domestic or foreign private issuers, mortgage-backed or other asset-backed securities, debt securities convertible into equity securities, inflation-indexed bonds, structured notes, loan assignments and loan participations. The Fund may invest up to 35% of its net assets in "junk bonds," corporate loans and distressed securities. The Fund may also invest in real estate investment trusts ("REITs")." |

|  | assets in "junk bonds," corporate loans and distressed securities. The Fund may also invest in Real Estate Investment Trusts ("REITs") and securities related to real assets (like real estate- or precious metals-related securities) such as stock, bonds or convertible bonds issued by REITs or companies that mine precious metals. | doing so would be consistent with the Fund's investment objective. The Fund may hold a portion of its assets in cash or cash equivalents. | securities rated below investment-grade by independent rating agencies or are bonds that are unrated but that the Sub-Adviser believes are of comparable quality. The Fund may invest in corporate loans. |  |
|---|---|---|---|---|
| **Adviser** | BRA | Massachusetts Mutual Life Insurance Company | Jackson National Asset Management, LLC | Allianz Investment Management LLC |
| **Sub-Adviser** | BIM | BIM | BIM | BIM |
| **BIM Managers** | Dennis Stattman Dan Chamby Aldo Roldan | Dennis Stattman Dan Chamby Aldo Roldan | Dennis Stattman Dan Chamby Aldo Roldan | Dennis Stattman Dan Chamby Aldo Roldan |
| **Effective Sub-Adviser Fee Rate[3]** | 0.41% | 0.54% | 0.39% | 0.45% |

34.     Defendant BRA's markup for its investment management resulted in fees that are disproportionate to services rendered, could not be the product of negotiations conducted at arm's-length, and therefore constitutes a breach of defendant BRA's fiduciary duty to the Global Allocation Fund with respect to the receipt of such compensation.

**The Board Was Not Acting Conscientiously in Approving Defendant BRA's Investment Management Fees**

35.     Fund trustees have a fiduciary duty to mutual funds and to their shareholders (who, individually, have no power to negotiate such fees for the funds) to negotiate fees that are

---

[3] Effective Sub-Adviser Fee Rate calculated based on the most recent fiscal year for which full data is available.

both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's-length.  For the reasons discussed herein, the Board was not acting consistent with its fiduciary duty when it approved defendant BRA's excessive investment management fees, and allowed these fees to continue.

36.     Each of the funds in the BlackRock funds complex is governed by a group of trustees who meet, oversee, and make decisions for all the funds in the BlackRock funds complex.  The Board's purportedly independent members are compensated for their services.  As a result of the compensation they receive, Board membership in the BlackRock funds complex is lucrative for the fund trustees.  In 2013 alone, the trustees overseeing the funds in the BlackRock funds complex received total compensation in the following amounts:

| Director | Total Number of Portfolios Supervised | Aggregate Compensation from the BlackRock Funds Complex (Calendar Year Ended December 31, 2013) |
|---|---|---|
| James H. Bodurtha | 93 | $340,000 |
| Bruce R. Bond | 93 | $305,000 |
| Donald W. Burton | 93 | $305,000 |
| Stuart E. Eizenstat | 93 | $335,000 |
| Kenneth A. Froot | 93 | $305,000 |
| Henry Gabbay | 330 | $661,563 |
| Robert M. Hernandez | 93 | $420,000 |
| John F. O'Brien | 93 | $305,000 |
| Roberta Cooper Ramo | 93 | $305,000 |
| David H. Walsh | 93 | $340,000 |
| Fred G. Weiss | 93 | $375,000[4] |

37.     The Board has a separate and distinct fiduciary duty to each mutual fund in the BlackRock funds complex to enter into serious and substantive negotiations with respect to all fees charged by advisers, including defendant BRA.  Correspondingly, defendant BRA has a

---

[4] The two interested trustees, Paul L. Audet and Laurence D. Fink, did not receive compensation as trustees.

reciprocal fiduciary duty to each mutual fund under its management to assure that the fees it charges for services rendered are reasonably related to the services provided and correspond with fees that would be charged in an arm's-length negotiation.

38.     The trustees are supposed to be "watchdogs" for the Global Allocation Fund's shareholders.   The trustees, however, are precluded from properly monitoring the Global Allocation Fund because they are charged with the oversight of as many as *330* investment portfolios in the BlackRock funds complex.   Each fund has its own lengthy prospectus, regulatory filings, and compliance issues to review.

39.     Furthermore, even if statutorily "non-interested," the trustees are in all practical respects dominated and unduly influenced by defendant BRA in reviewing the fees paid by the Global Allocation Fund and its shareholders.   The trustees' continuation in the role of an independent trustee from year-to-year, and the compensation they earn, is at least partially dependent on the continued goodwill and support of defendant BRA.

40.     As discussed above, truly independent boards acting conscientiously would not have tolerated the investment management fees charged by defendant BRA if they had obtained adequate information regarding, among other things: (i) the services provided by the sub-advisers, and the fees the sub-advisers charged for such services, as compared to the investment management fees that defendant BRA charged for its minimal services; (ii) the economies of scale enjoyed by defendant BRA; and (iii) the profitability of the Global Allocation Fund to defendant BRA.

41.     Accordingly, given the reasons above, the Board did not act conscientiously and therefore breached its fiduciary duty when it approved defendant BRA's investment management fees.  The Board's lack of conscientiousness resulted in fees that are disproportionate to the value

of the services rendered.

**COUNT I**

**Against Defendant BRA Pursuant to Section 36(b)**
**Derivatively on Behalf of the Global Allocation Fund**
**(Investment Management Fees)**

42.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

43.    Defendant BRA had a fiduciary duty to the Global Allocation Fund and its investors with respect to the receipt of compensation for services and payments of a material nature made by and to defendant BRA.

44.    The fees charged by defendant BRA for providing investment management services to the Global Allocation Fund breached defendant BRA's fiduciary duty to the Global Allocation Fund with respect to such compensation.

45.    This Count is brought by plaintiff derivatively on behalf of the Global Allocation Fund against defendant BRA for breach of its fiduciary duties with respect to the receipt of compensation as defined by Section 36(b).

46.    The excessive fees received by defendant BRA were in breach of its fiduciary duties to the Global Allocation Fund with respect to such compensation.  By reason of the conduct described in this complaint, defendant BRA violated Section 36(b).

47.    As a direct, proximate, and foreseeable result of defendant BRA's breach of fiduciary duties in its role as investment adviser to the Global Allocation Fund and its investors, the Global Allocation Fund and its shareholders have sustained hundreds of millions of dollars in damages.

48.    In charging and receiving inappropriate, unlawful, and excessive compensation,

and in failing to put the interests of plaintiff, and other shareholders of the Global Allocation Fund ahead of its own interests, defendant BRA has breached and continues to breach its statutory fiduciary duty to the Global Allocation Fund and its shareholders in violation of Section 36(b).

49.     Plaintiff seeks, pursuant to Section 36(b)(3), the actual damages resulting from the breach of fiduciary duty by defendant BRA, up to and including, the amount of compensation or payments received from the Global Allocation Fund and earnings that would have accrued to the Global Allocation Fund's shareholders had that compensation not been paid.

50.     Alternatively, plaintiff seeks rescission of the contracts and restitution of all the excessive fees paid pursuant thereto. *See* ICA section 47(b), 15 U.S.C. §80a-46(a-b).  When a violation of the ICA has occurred, a court may order that the IMA between defendant BRA and the Global Allocation Fund, on behalf of the Global Allocation Fund, be rescinded, thereby requiring restitution of all investment management fees paid to it by the Global Allocation Fund from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     An order declaring that defendant BRA has violated and continues to violate Section 36(b) through the receipt of fees from the Global Allocation Fund that breach defendant BRA's fiduciary duty with respect to the receipt of compensation.

B.     An order preliminarily and permanently enjoining defendant BRA from further violations of the ICA.

C.     An order awarding compensatory damages on behalf of the Global Allocation Fund against defendant BRA, including repayment of all unlawful and/or excessive investment management fees paid to it by the Global Allocation Fund or its shareholders from one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.  Plaintiff reserves the right to seek punitive damages where applicable.

D.     An order rescinding the IMA between defendant BRA and the Global Allocation Fund, including restitution of the excessive investment management fees paid to defendant BRA by the Global Allocation Fund from a period commencing one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.

E.     Such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 28, 2014

WOLLMUTH MAHER & DEUTSCH LLP

David H. Wollmuth (DW-9618)
dwollmuth@wmd-law.com
Frederick R. Kessler (FK-8168)
fkessler@wmd-law.com
One Gateway Center
Newark, NJ 07102
(973) 733-9200

Attorneys for Plaintiff

Of Counsel:

ROBBINS ARROYO LLP
Brian J. Robbins

Stephen J. Oddo
Edward B. Gerard
Justin D. Rieger
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
soddo@robbinsarroyo.com
egerard@robbinsarroyo.com
jrieger@robbinsarroyo.com

940161

<u>VERIFICATION</u>

I, Brendan Foote, hereby declare as follows:

I am the Trustee for the Separate Property TR U/A DTD 10-26-12, the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 3/27/14

_____
TRUSTEE